## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL INDICTMENT** |
| **v.** | **NO. 1:14-CR-321-WSD-GGB** |
| **TAVARIS WILLIAMS,** | |
| **Defendant.** | |

## FINAL REPORT AND RECOMMENDATION

Defendant Tavaris Williams ("Defendant") is charged with possession of a firearm by a convicted felon, in violation of Title 18 U.S.C. § 922(g)(1) and 924(e), (Doc. 1, Count One);  and possession a stolen firearm, in violation of Title 18 U.S.C. § 922(j), (Doc. 1, Count Two).   Pending before this court are Defendant's Motion to Suppress Statements, (Doc. 10), and Motion to Suppress Evidence and Statements, (Doc. 12).  An evidentiary hearing on these motions was held before me on October 29, 2014.  For the reasons discussed below, I **RECOMMEND** that Defendant's Motion to Suppress Statements, (Doc.  10), and his Motion to Suppress Evidence and Statements, (Doc. 12), be **DENIED.**

## I.    FACTS

All of the facts pertinent to the pending motion are from the evidentiary hearing held on October 29, 2014. (Doc. 23 [hereinafter "Tr."]). Based on the testimony and evidence, I make the following findings of fact. On April 23, 2014, at 7 p.m., Caleb Munson, an Atlanta city police officer, received a call from dispatch that five males were smoking drugs in the hallway of 583 Boulevard, in Atlanta. (Tr. 5-6). As Munson approached the building with another officer, Officer Jones, Munson saw smoke coming from the door of the building and smelled both raw and burning marijuana. (Tr. 7, 23). Munson opened the door, smoke came out, and Munson saw five males inside the hallway. (Tr. 8). Throughout the encounter in the hallway, there were two officers and five non-officers. (Tr. 35-36). Munson was in uniform, but did not have his weapon drawn. (Tr. 24). Munson also saw "roach guts,"[1] but not marijuana leaves, on the ground and both "roach guts" and marijuana leaves on "their clothing." (Tr. 8, 31). Munson did not see anyone with a marijuana joint in his hands, and did not recall if he saw marijuana on Williams' clothing. (Tr. 9, 32).

---

[1] Munson testified that "roach guts" consist of the tobacco from a cigar, which is removed and replaced with marijuana. (Tr. 8-9).

2

Munson asked the group what they were doing, and someone replied that they were "smoking."  (Id.).  Munson also asked if anyone lived in the building, and "a couple of them, to [Munson's] knowledge said no, or were muttering no, basically being -- not looking at us or not giving us a straightforward answer."  (Tr. 9-10).  Munson also testified that, from his experience working in that building, he did not think that any of them lived there.  (Tr. 10).

Munson testified that next, "Because of the raw marijuana, the paraphernalia, we went to detain everybody for the investigation because everybody was, like, no, we don't live here."  (Tr. 10).  Munson first detained a person who was sitting on the stairs, placing him in handcuffs, while Jones placed another person in handcuffs.  (Tr. 9-10, 33-34).  That person was sitting "right across the foyer" from Williams, and Jones was visible from Williams' vantage point.  (Tr. 39-40, 42).  "A minute" later, Munson went to detain Williams.  (Tr. 9).

Williams was against the wall near the entrance to the hallway, near two of the other males.  (Tr. 11, 30).  Munson testified that his usual procedure with the odor of marijuana was to pat a detainee down to make sure that he does not have illegal narcotics on his person.  (Tr. 12).  Munson approached Williams, asked him to turn around and put his hands behind his back, and asked if he had "anything

3

illegal." (Tr. 12, 36-37). Williams turned around and told Munson that he had a pistol in his pocket. (Tr. 12, 36). Munson then placed Williams in handcuffs and took the pistol. (Tr. 45).

Munson testified that, before asking Williams if he had anything illegal, he had decided that he would detain and pat down Williams regardless of his answer. (Tr. 12). Asked if he had any reason to believe that anyone had a gun on him at the time, Munson testified "I can never know," and Munson was unaware of any previous reports of violence at that building. (Tr. 24, 28). Munson also did not see the outline of a gun in Williams' pants before Williams told him that he had a gun. (Tr. 44). After returning to the precinct, Williams asked to speak with Munson, Munson read Williams his <u>Miranda</u>[2] rights, and Williams told Munson that he had bought the gun for $300 in Decatur. (Tr. 16-17, 48).

Kenneth Fisher, an Atlanta police officer assigned as a task officer to the Bureau of Alcohol, Tobacco, Firearms, and Explosives met with Williams on August 28, 2014, after Williams was indicted on the present federal charges. (Tr. 59). Fisher conducted an interview of Williams along with another task force

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4

officer.  (Tr. 66).  Williams was in handcuffs while being brought to the interview and in leg shackles throughout the interview.  (Tr. 66-68; Def. Exh. 15).

The interview with Fisher, another agent, and Williams was recorded.  (Def. Exh. 15).  The first five-and-a-half minutes of the video consist of Fisher asking Williams about biographical and emergency-contact information.  (Def. Exh. 15 at 00:00–05:38; Tr. 70-71).  Fisher then handed Williams a copy of the warrant for his arrest.  (Def. Exh. 15 at 05:36–05:39).  Williams read the warrant and asked about the designation of "armed career criminal."  (Id. at 06:00–06:05).  Fisher stated that he could not go into detail because he had not yet read Williams his rights.  (Id. at 06:07–06:12).

After reading it, Williams returned the warrant, and Fisher asked if Williams understood what was going on and if he wanted to talk about it.  (Id. at 07:43–07:56).  Fisher then told Williams that he was arrested and would be taken to a detention center that night, taken to federal court in the morning and assigned an attorney, and would probably have a detention hearing postponed until sometime the following week.  (Id. at 07:58–08:20).  Williams asked what he was charged with, and Fisher read the charges.  (Id. at 08:21–08:29).  Fisher again asked if Williams wanted to talk about it,  Williams asked what there was to talk about, and Fisher

AO 72A
(Rev.8/8
2)

stated, "It's a yes or no question" and told Williams that he did not need to talk about it.  (Id. at 08:33–08:45).  At that point Williams agreed to "talk about it."  (Id. at 08:46–08:47).

While the agents searched for a Miranda card, Williams asked again about the career criminal designation, and Fisher said they would talk about it after he read Williams his rights.  (Id. at 10:13–10:30).  A few minutes later, Fisher ensured that Williams wanted to speak with him.  (Id. at 14:18–14:21).  Fisher then read Williams his Miranda rights, and Williams stated that he was willing to talk without an attorney.  (Id. at 14:22–14:44).  During the course of the ensuing interview, Williams made several incriminating statements about his possession of the gun. (See id. at 17:15–17:20 (saying the gun belonged to a friend but he "just had it"); id. at 19:10–19:30 (saying that he bought the gun for a friend named Joe); id. at 25:36–25:44 (explaining that he kept the gun because Joe never paid him for it).

## II.    DISCUSSION

### A.    Officer Munson seized Williams without a warrant

A defendant asserting rights under the Fourth Amendment has the initial burden of demonstrating that a warrantless search or seizure occurred.  See United States v. Bachner, 706 F.2d 1121, 1125-26 (11th Cir. 1983).  In determining

AO 72A
(Rev.8/8
2)

whether a seizure occurred, the Supreme Court has said, "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Drayton, 536 U.S. 194, 201, 122 S.Ct. 2105, 2110, 153 L.Ed.2d 242 (2002). Said another way, a seizure occurs under the Fourth Amendment where police use physical force or a show of authority to restrain a person's freedom of movement. United States v. Perez, 443 F.3d 772, 778 (11th Cir. 2006).

The government does not dispute that a seizure had occurred by the time Williams told police that he had a gun on him. (See Doc. 29). Williams was not yet placed in handcuffs when he first told Officer Munson that he had a pistol. (See Doc. 23 at 35-37). Nevertheless, I find that Munson seized Williams when he approached him and instructed him to place his hands behind his back. (See id.). A reasonable person, placed in that situation, particularly after Munson had handcuffed at least one other person who was with Williams, would not have felt free to terminate the encounter. See Drayton, 536 U.S. at 201, 122 S.Ct. at 2110; (see also Doc. 23 at 33).

**B.    The initial seizure was justified based on reasonable suspicion of illegal drug use and possession**

The fact that a warrantless seizure occurred is not the end of the Fourth Amendment inquiry, as the Constitution prohibits only "unreasonable" searches and

7

seizures.  Once the movant establishes that a warrantless search or seizure occurred, the burden shifts to the government to establish that an exception to the warrant requirement applied and that the search was reasonable.  Bachner, 706 F.2d at 1126.

There are three categories of police-citizen encounters that require different levels of justification: (1) encounters involving no coercion or detention; (2) brief seizures or investigative detentions; and (3) full-scale arrests.  United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989).  A full-scale arrest requires probable cause that a crime has been committed.  United States v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986).  A brief investigative detention may be carried out where there is a reasonable suspicion of criminal activity.  United States v. Williams, 876 F.2d 1521, 1523 (11th Cir. 1989).  A "reasonable suspicion" is an "obviously less demanding" standard than "probable cause."  United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).

The government makes two arguments that the search and seizure of Williams was reasonable: (1) Munson searched Williams incident to a lawful arrest, which was supported by probable cause; and (2) Munson learned of the gun Williams pursuant to a lawful investigative Terry[3] stop.  (Doc. 29).  Williams does not dispute

---

[3] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

8

that, at the outset of the encounter, the police were entitled to carry out a brief

investigative detention.  (See Doc. 32 at 17).  Accordingly, I find that the totality of

the circumstances, consisting of the presence of smoke, the strong odor of

marijuana, and the observation of marijuana leaves and paraphernalia gave police

reasonable suspicion that a crime had been committed, permitting, at the least, a

brief investigative detention.  See United States v. Griffin, 109 F.3d 706, 708 (11th

Cir. 1997)(holding that, during a traffic stop, the strong odor of marijuana and

inconsistent answers to questions by a car's occupants gave rise to reasonable

suspicion).[4]

_____

[4] The direct relevance of Griffin and other cases like it are limited by their context—specifically that they involved automobiles.  I cite Griffin only for the proposition that the odor of marijuana can give rise to reasonable suspicion, warranting a Terry stop.  However, the authorized scope of any detention cannot be fully analogized.

Contrary to the government's suggestion, (see Doc. 29 at 9-10), the odor of marijuana does not always permit a "warrantless search for evidence."  An exception to the warrant requirement or an exigency must still exist to justify a search.  The case cited by the government for that proposition, United States v. Villarreal, 565 F.2d 932, 937 (5th Cir. 1978), involved the search of a trunk of an automobile.  A search of an automobile typically falls under an exigency, because of the inherent mobility of any evidence contained therein.  See United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990).  Therefore, the fact that the odor of marijuana emanating from a car authorizes an immediate warrantless search does not mean that a search was authorized under the facts of this case.

9

**C.     Officer Munson's question of whether Williams possessed anything illegal was within the scope of the <u>Terry</u> stop, and the encounter had not yet evolved into a full-scale arrest**

When a <u>Terry</u> stop is authorized, "[t]he scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." <u>Terry</u>, 392 U.S. at 19, 88 S.Ct. at 1878 (quotation omitted).  Generally, where a reasonable suspicion of criminal activity exists, the officer "may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions." <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 373, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993)(quotation omitted).  A patdown search is authorized under <u>Terry</u> where the officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others." <u>Id.</u> (quoting <u>Terry</u>, 392 U.S. at 24, 88 S.Ct. at 1881).  Such a search "must be strictly limited to that which is necessary for the discovery of weapons." <u>Id.</u> at 373, 113 S.Ct. at 2130.  A search that goes beyond what is necessary to determine if a suspect is armed is not valid under <u>Terry</u>.  <u>Id.</u>

10

**1.  Officer Munson's reasonable suspicion of illegal drug use was sufficiently particularized as to Williams**

Williams argues that the suspicion of drug use was not individualized to him, citing <u>Ybarra v. Illinois</u>, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).  In doing so, Williams overstates the reasoning and holding of <u>Ybarra</u>.  In <u>Ybarra</u>, police investigating a drug offense had a warrant to search a bar and one of its bartenders.  <u>Id.</u> at 88, 100 S.Ct. at 340-41.  Upon arriving at the bar, police proceeded to do a "cursory search for weapons" of each of the bar's patrons.  <u>Id.</u> at 88, 100 S.Ct. at 341.  Police found heroin in the pocket of Ybarra, who was one of the customers.  <u>Id.</u> at 88-89, 100 S.Ct. at 341.  The Supreme Court held the search of Ybarra to be unconstitutional, because nothing that gave rise to the warrant or that occurred in the bar suggested Ybarra's criminality beyond his presence in a public bar where police had probable cause to believe that somebody else was selling heroin.  <u>Id.</u> at 90-91, 100 S.Ct. at 342.

Williams is correct that <u>Ybarra</u> stands for the proposition that individualized suspicion or cause is required before a search or seizure can occur, and that mere presence in a location is insufficient.  However, <u>Ybarra</u> does not preclude a finding that the same set of circumstances can give rise to reasonable suspicion of each member of a small group.  Nothing about Ybarra's actions or the nature of the bar in

11

Ybarra suggested that the defendant there was engaged in criminal activity.  For example, there was no evidence that anyone in the bar was openly using drugs.

The Supreme Court addressed the scope of Ybarra in Maryland v. Pringle, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).  In Pringle, police pulled over a car with three people inside and found cocaine, giving rise to probable cause that a felony had been committed. 540 U.S. at 370, 124 S.Ct. at 799.  The cocaine was found in the back seat,  "accessible to all three men," and $763 in rolled-up cash was found in the glove compartment.  Id. at 368, 372, 124 S.Ct. at 798, 800.  Pringle, the front-seat passenger, argued that police lacked probable cause that *he* had committed a crime.  Id. at 370, 124 S.Ct. at 799.  The Supreme Court disagreed, holding that probable cause existed as to each of the small number of people who had access to the illegal drugs.  Id. at 371-74, 124 S.Ct. at 800-02.

In reaching its holding in Pringle, the Court distinguished the case from Ybarra.  It emphasized that Pringle and his companions were "in a relatively small automobile, not a public tavern."  Id. at 373, 124 S.Ct. at 801.  The Court's further reasoning that being in a car could suggest a common enterprise does not apply here.  See id.  However, the broader point regarding probable cause or reasonable

12

suspicion—that, where evidence of illegality is found central to a group of individuals, context matters—is instructive here.

Pringle presents the better framework for this case. Police encountered Williams in a hallway that was leaking marijuana smoke. (See Tr. 7, 23). At the very least, that gave officers a reasonable suspicion that each person in the hallway was aware of the presence of marijuana and therefore more than merely present in a place where someone else was in possession of illegal drugs. While not in a car, Williams, like Pringle, was not in the same position as an apparently "unwitting tavern patron." Pringle, 540 U.S. at 373, 124 S.Ct. at 801 (quoting Wyoming v. Houghton, 526 U.S. 295, 304, 119 S.Ct. 1297, 1302, 143 L.Ed.2d 408 (1999). Unlike in Ybarra, Williams was more than just present near someone else who had something illegal on his person. Rather, he, along with everyone in a relatively small hallway, (see Gov. Exh. 1; Def. Exh. 5)(photographs depicting the hallway), was present amidst apparent illegality. Therefore, reasonable suspicion of criminal activity existed as to Williams.

### 2. Officer Munson did not exceed the scope of the Terry stop, which did not mature into a full-scale arrest

I find that Officer Munson's question (whether Williams had "anything illegal") was within the scope of circumstances that gave rise to the Terry stop. (See

Tr. 12, 36-37).  Munson had reasonable suspicion of illegal drug use and possession, and his question was reasonably aimed at confirming or dispelling that suspicion. See Dickerson, 508 U.S. at 373, 113 S.Ct. at 2135.  In response to Munson's permissible inquiry, Williams stated that he had a gun.  (See Tr.12, 36).  That gave Munson reason to believe that officer safety might be threatened by a weapon, permitting him to pat down Williams and recover the gun without the encounter maturing into a full-scale arrest.  See Dickerson, 508 U.S. at 373, 113 S.Ct. at 2135.

Before Williams answered Munson's question, however, no such pat down would have been authorized.  Before learning of Williams' gun, Munson had no reason to believe that a weapon posed a threat to officer safety.  Munson testified that, per his usual practice, he intended to pat Williams down to search for drugs, even if Williams had not stated that he had a gun.  Williams is correct insofar as he argues that such a pat down would have exceeded the scope of the Terry encounter and thus would have required probable cause.  See  Dickerson, 508 U.S. at 373, 113 S.Ct. at 2135; see also United States v. Mosquera-Ramirez, 729 F.2d 1352, 1356 (11th Cir. 1984)("Once a *Terry* stop exceeds its carefully circumscribed limits, the police must observe the probable cause requirement.").  However, the pat down here occurred only after Munson learned of the weapon.

14

Williams' best argument that a full-scale arrest occurred would be that he observed Munson and his partner place others in the hallway in handcuffs before Munson approached him.  That could signal to Williams that the encounter was more intrusive or coercive than a "brief seizure," even before he himself was placed in handcuffs.  See United States v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986).  However, the use of handcuffs does not automatically convert a Terry stop into a full-scale arrest.  See Hastamorir, 881 F.2d at 1556.  Evaluating the totality of the circumstances, handcuffing may be part of an investigative detention where it is reasonable.  Id. at 1556-57.  In particular, the use of handcuffs may be reasonable where done to protect the officers.  Id.  Despite not having any reason to believe that any of the individuals had a weapon, the police were outnumbered five to two in a relatively small space.  (See Tr. 35-36).  Under such circumstances, the use of handcuffs was reasonable and did not mature the encounter to an arrest.  Likewise, Williams cannot said to have been arrested here based on his observation of others being placed in handcuffs.

> **3.** **Even if Williams' detention evolved into a full-scale arrest before he stated that he had a gun, the arrest was supported by probable cause**

Even if the encounter between Munson and Williams was a full-scale arrest before Williams stated that he had a gun, that arrest would have been supported by probable cause, and Munson would have been entitled to search Williams incident to that arrest.  Possession of any amount of marijuana is a crime in Georgia.  O.C.G.A. §§ 16-13-2(b)(misdemeanor for possession of one ounce or less) and 16-13-30(j)(felony for all other amounts).  A conviction in Georgia for marijuana possession can be based on joint and constructive possession.  McNeal v. State, 326 Ga.App. 429, 431, 756 S.E.2d 660, 664 (Ct. App. Ga. 2014).

Mere presence near contraband without proof of participation is insufficient to carry the burden of proof at trial that a defendant constructively possessed the contraband.  Id.  However, probable cause requires that there be sufficient information available to officers that a prudent person would believe that a suspect is committing an offense.  Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997).  As discussed above, Williams was more than merely present around someone who possessed marijuana.  Williams was in a small area with few other people where officers smelled (and saw) marijuana smoke and observed cigar tobacco on the ground.  Those observations gave Munson probable cause to arrest the present individuals.  See United States v. Crawford, 568 F. App'x 725, 726 (11th

Cir.)(unpublished), <u>cert. denied</u>, 135 S.Ct. 737 (2014)(officers who smelled

marijuana coming from a car and observed a cup containing cigar tobacco had

probable cause to arrest driver and passenger for marijuana possession).[5]

Given that an arrest of Williams would have been lawful based on probable

cause, a search of his person also would be authorized incident to that arrest.  <u>United</u>

<u>States v. Robinson</u>, 414 U.S. 218, 224, 94 S.Ct. 467, 471, 38 L.Ed.2d 427 (1973).

Accordingly, even if Munson exceeded the scope of the authorized <u>Terry</u> stop,

transforming the encounter into an arrest, that arrest was supported by probable

cause, and the discovery of the gun on Williams' person was discovered pursuant to

a lawful search incident to that arrest.

> **D.** **As no constitutional violation occurred in discovering Williams' gun, Williams' April 23 statement cannot be suppressed as "fruit of the poisonous tree"**

---

[5]As previously discussed (n.4), the fact that <u>Crawford</u> involved an automobile does not lessen its relevance to what evidence gives rise to probable cause.  The only potential difference would be the relative confinement of an automobile.  Had Williams been seized in a large area, that distinction might make a difference, but given the small area in which Williams, the marijuana smoke, and the "roach guts" were observed, the distinction does not make a difference here.

AO 72A
(Rev.8/8
2)

Evidence that is not obtained directly through a constitutional violation, but nevertheless derived from such a violation, is inadmissible at trial as "fruit of the poisonous tree." United States v. Terzado-Madruga, 897 F.2d 1099, 1112 (11th Cir. 1990). In other words, illegally gained evidence cannot be exploited to gain further evidence. Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Here, as I have concluded that no illegality occurred at the outset, and Williams advances no other argument that his April 23 statement should be suppressed, I find that it may be admitted at trial. (See Doc. 24 at 23-25).

### E.   Williams' August 28, 2014 Miranda waiver and subsequent statements were not the product of coercion

Williams argues that the statements he gave to Officer Fisher on August 28, 2014 were coerced. (Doc. 24 at 25). He contends that Fisher's actions in getting Williams to agree to speak with him before he administered Miranda warnings functioned to soften the effect of the warnings. He compares his case to Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), but concedes that the interrogation in Seibert took a different form than the one here. He also argues that Fisher added to the coercive nature of the encounter by informing Williams that he was being charged as an armed career criminal and by telling Williams that he

18

would not see a lawyer until the next day and probably would not have a bond

hearing for a few days.

The video of the interrogation established that Williams was advised of his

Miranda rights before he made any incriminating statements. The inquiry into

whether such a waiver was voluntary is twofold:

> First, the relinquishment of the right must have been
> voluntary in the sense that it was the product of a free and
> deliberate choice rather than intimidation, coercion, or
> deception. Second, the waiver must have been made with a
> full awareness of both the nature of the right being
> abandoned and the consequences of the decision to abandon
> it.  Only if the totality of the circumstances surrounding the
> interrogation reveal both an uncoerced choice and the
> requisite level of comprehension may a court properly
> conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986)

(internal quotation marks and citations omitted)(decided in 28 U.S.C. § 2254

context).

In Seibert, the Supreme Court held that police violated Miranda where they

obtained a confession from a defendant, then read the defendant Miranda warnings,

and then had the defendant repeat the confession.  Seibert, 542 U.S. at 617, 622, 124

S.Ct. at 2613, 2616.  The plurality opinion highlighted that the pre-Miranda portion

of the interview was exhaustive, took place only minutes before the post-Miranda

portion of the interview, and nothing in the <u>Miranda</u> warnings suggested to the defendant that her pre-warning statements could not be used against her in court.  <u>Id.</u> at 616, 124 S.Ct. at 2612.  In a concurring opinion, which gave the holding a majority, Justice Kennedy  limited the Court's holding to cases where a "deliberate two-step strategy is employed," and limited the remedy to the exclusion of "postwarning statements that are related to the substance of prewarning statements . . . unless curative measures are taken before the postwarning statement is made."  <u>Id.</u> at 622, 124 S.Ct. at 2616 (Kennedy, J., concurring); <u>see also</u> <u>United States v. Street</u>, 472 F.3d 1298, 1313 (11th Cir. 2006)(explaining that, because the decision was a plurality, and Justice Kennedy's opinion rested on narrower grounds, Kennedy's concurrence represents the controlling law).

The Eleventh Circuit recognized the limits of <u>Seibert</u> in <u>United States v. Gonzalez-Lauzan</u>, 437 F.3d 1128 (11th Cir. 2006).  In <u>Gonzalez-Lauzan</u>, the police decided not to administer <u>Miranda</u> warnings to a suspect while they described the evidence they had collected against him.  <u>Gonzalez-Lauzan</u>, 437 F.3d at 1130-31. The officers specifically told the suspect that they were not asking him questions and did not want him to say anything.  <u>Id.</u> at 1131.  The officers occasionally paused to allow the suspect to offer an answer, and the suspect occasionally responded to

20

the evidence being read.  Id.  Approximately two-and-a-half hours into that meeting, the suspect stated "okay, you got me," at which point police read him his Miranda rights, and, in the subsequent interview, the suspect made several incriminating statements.  Id.  The district court suppressed Gonzalez-Lauzan's pre-warning statements, but admitted the post-warning statements.  Id. at 1131-32.

The Circuit held that Seibert did not apply to the type of "two-step interrogation" employed in Gonzalez-Lauzan.  Id. at 1139.  Unlike in Seibert, the first phase of the interrogation was not aimed at eliciting an incriminating statement, and nothing that Gonzalez-Lauzan said post-warnings related to anything he said pre-warnings.  Id.  The Court went on to conclude that nothing about the procedure or the Miranda warnings suggested that the defendant's waiver of rights was uninformed, coerced, or involuntary.  Id.  Further, the statement were admissible because a reasonable suspect in Gonzalez-Lauzan's shoes was given "a genuine choice whether to follow up on [his] earlier admission."  Id. (citing Seibert, 542 U.S. at 616, 124 S.Ct. at 2612)(alteration in original).

Under the guidance of Gonzalez-Lauzan, and applying the broader two-part inquiry found in Moran, I conclude that, considering the totality of the circumstances, Williams' post-Miranda statements were not coerced or otherwise

21

involuntary.  Further, applying <u>Moran</u>'s test, nothing suggests that Williams did not comprehend the warnings.  As an initial matter, <u>Seibert</u> does not apply.  To the extent that Fisher conducted a two-step interrogation here, Williams made no incriminating (or, for that matter, substantive) statements prior to <u>Miranda</u> warnings being administered.  Accordingly, there were no post-warning statements that were similar to any pre-warning statements, and Williams was not coerced into making an inculpatory statement through his knowledge that he had already made such statements.  <u>See</u> <u>Seibert</u>, 542 U.S. at 622, 124 S.Ct. at 2616.

I find that Fisher asking Williams if he agreed to talk before administering <u>Miranda</u> warnings was not coercive to an extent that the properly-given warnings did not give Williams the "real choice between talking and remaining silent."  <u>See</u> <u>Seibert</u>, 542 U.S. at 609, 124 S.Ct. at 2608.  Further, Fisher informing Williams that he would be transferred to jail and would not receive a hearing for a few days was also not coercive to the point of overriding the subsequent <u>Miranda</u> warning, as Fisher made no suggestion, explicit or implicit, that speaking with the officers would alleviate that timeline or result in any benefit.  Last, Fisher making Williams aware that he was being charged as an armed career criminal also does not render his subsequent waiver involuntary.  Any coercion from providing Williams with the

AO 72A
(Rev.8/8
2)

warrant was far less than what resulted from the more than two hours the police in Gonalez-Lauzan spent reciting evidence before that defendant waived his rights. Accordingly, the police action here did not deprive Williams of the choice to decline to speak with the police.

## III.   CONCLUSION

In sum, I **RECOMMEND** that Defendant's Motion to Suppress Evidence and Statements, (Doc. 10), and his Motion to Suppress Evidence and Statements, (Doc. 12), be **DENIED**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial.  It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

It is so **ORDERED** and **RECOMMENDED**, this 13th day of March, 2015.

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)